[Civ. No. 20541. First Dist., Div. Three. Feb. 14, 1963.]

THE WESTERN PACIFIC RAILROAD COMPANY, Plaintiff and Appellant, v. STATE BOARD OF EQUALIZATION, Defendant and Respondent.

E. L. Van Dellen and Leighton Hatch for Plaintiff and Appellant.

Stanley Mosk, Attorney General, Ernest P. Goodman and Harry W. Low, Deputy Attorneys General, for Defendant and Respondent.

DEVINE, J.—The question is whether the levy of the use tax made by the state against two self-propelled diesel electric cranes is violative (1) of the commerce clause of the Constitution of the United States, or (2) of section 2015 subdivision (b) of title 18 of the Administrative Code of California.

In this action to recover the paid taxes, the parties have stipulated to the facts. Western Pacific, a California corporation which has its headquarters in San Francisco, operates as an interstate carrier between Nevada, California, and Utah, and also conducts intrastate operations in each of these states. In the relevant years, it operated 1192.51 miles of railroad, of which 596.17 miles were in California, 450.5 miles in Nevada, and 145.84 miles in Utah. In addition, it had two wholly owned California subsidiaries, Sacramento Northern Railway (operating solely in the Sacramento Valley communities of California) and Tidewater Southern Railway (operating freight lines in the San Joaquin Valley of California), the mileage of which roads does not appear. During the year 1952, appellant's revenues, exclusive of those of subsidiaries, attributed to California sources were about 45.8 per cent of its total revenues. In 1952, 69.95 per cent of the railroad's real and personal property, excluding rolling stock, was in California; 49.24 per cent of the rolling stock was in California; and 64.52 per cent of appellant's road and equipment was attributed to California.

In 1952, the railroad purchased a locomotive crane, unit no. 89, and a piledriver crane, unit no. 90, in Michigan. It was the intention of the railroad's officers to use both cranes for operations in California, Nevada, and Utah, whenever and wherever the cranes should be needed; but it was not intended to assign the cranes permanently to any one state. The railroad has never assigned the cranes permanently or otherwise in its records to any of the three states, but has designated each crane as "system maintenance of way work equipment."

Plaintiff maintains a service yard at Elko, Nevada. After

purchase and delivery of the locomotive crane, it was shipped by railroad from Bay City, Michigan, to plaintiff at Shafter, Nevada, and then moved to Elko, Nevada, where it arrived on June 24, 1952. From June 24, 1952, to July 7, 1952, the crane was inspected, adjusted, and made ready for use. It entered service at Elko, Nevada, loading cars there. During the period July 8, 1952, to July 17, 1952, unit 89 performed the following services:

July 8, 1952
to Loading boilers, Wendover, Utah
July 9, 1952

July 11, 1952
to Loading material, Wendover, Utah
July 16, 1952

July 17, 1952 Unloading rail, Elko, Nevada

About July 19, 1952, this crane entered the State of California by being coupled onto a freight train on plaintiff's railroad and hauled with other freight into California. From July 20, 1952, until November 28, 1952, the crane was used in service in California, and in the rest of the year, in all three states. Its use in 1952 is given in the footnote.[1]

Throughout the years 1953 and 1954, the crane was alter-

[1] July 20, 1952 to November 10, 1952 — In service at Sacramento, California, loading and unloading materials and supplies for plaintiff's store department and mechanical department

November 10, 1952 to November 28, 1952 — Various work in the repair and relining of a tunnel in the Feather River Canyon, California

December 2, 1952 — Unloading cisterns and picking up stringers at Gerlach, Nevada

December 3, 1952 to December 5, 1952 — Unloading rail at Portola, California

December 10, 1952 — Unloading cisterns, Bronte, Nevada

December 15, 1952 — Unloading cisterns, Wendover, Utah

December 17, 1952 — Unloading cisterns and picking up derailed car on Ellerback Branch in Utah

December 22, 1952 to December 23, 1952 — Picking up rail and doing various work for bridges and building gang at Elko, Nevada

December 26, 1952 to December 31, 1952 — Various work on a bridge at Winnemucca, Nevada

nately used at various places on plaintiff's line in the states of Nevada and California, but not in Utah.

Following purchase and delivery, the piledriver crane, unit no. 90, was shipped by railroad from Bay City, Michigan, consigned to plaintiff at Shafter, Nevada, whence it was moved to Elko, Nevada, on May 27, 1952. During the period May 27, 1952, to June 18, 1952, the crane was serviced, adjusted, and otherwise made ready for service. From June 19, 1952, to July 1, 1952, the piledriver crane was in service driving piles on a bridge in Winnemucca, Nevada.

About July 2, 1952, this crane entered the State of California by being coupled onto a freight train on plaintiff's railroad and hauled by the train. It was put to use in California driving piles on a bridge near Hawley, California, during the period July 2, 1952, to July 7, 1952. From July 7, 1952, to December 31, 1952, the crane was used at various places on plaintiff's railroad line in California. During the years 1953 and 1954, it was used at various places on plaintiff's railroad line in the states of California, Nevada, and Utah.

No attempt has been made by the parties to segregate the interstate from the intrastate operations of the cranes, and it would seem likely that such segregation would be extremely difficult, if not impossible, because the work they perform is auxiliary to both operations.

No sales or use tax has been levied by Nevada, Utah, or any other state, except California, as to either crane. The State of Nevada did not have a use tax act until 1955.

The State Board of Equalization has adopted, among its rules, the following rule 55, Sales and Use Tax Regulations (Cal. Admin. Code, tit. 18, § 2015 subd. (b) ): "Use tax applies with respect to any tangible personal property purchased for storage, use or other consumption in this State the sale of which is exempt from sales tax under this ruling . . . except property purchased for use in interstate or foreign commerce, placed in use in interstate or foreign commerce prior to its entry into this State, and thereafter used continuously in interstate or foreign commerce."

The board has an established administrative practice of levying the use tax on tangible personal property if such property is brought to California within 90 days of its purchase and delivery outside the state, and such property is present, stored, used or otherwise consumed in the state over

one half the time during the first six-month period after entering the state, the board having determined that the six-month period is a reasonable one for determining the place of principal use. Both of the cranes fall within the scope of this administrative practice.

The trial court concluded that the cranes were purchased for storage and use in the State of California, that they were stored and used in this state, and that there was a period of time which constituted a taxable moment after the cranes arrived in this state, when they were stored and used by the railroad in intrastate commerce, and that the use tax was validly and constitutionally applied to said intrastate use.

Although appellant, in its complaint, contended that the levy violates two provisions of the Constitution of the United States, namely, the commerce clause and the due process clause of the Fourteenth Amendment, the subject of due process has not been argued in its briefs, so that the single constitutional point is the one first mentioned, and as to this point it is the claim of appellant that it has been exposed to multiple taxation because there may be "repeated exactions" of the use tax in Nevada and Utah. Besides this constitutional point, appellant contends that the state itself, by rule 55 of the Sales and Use Tax Regulations, has determined that the use tax should not be applied to the transaction.

### The Use Tax and Interstate Commerce

The commerce clause does not immunize interstate instrumentalities from all state taxation, and such commerce may be required to pay a nondiscriminatory share of the tax burden. (*Braniff Airways, Inc.* v. *Nebraska State Board of Equalization & Assessment,* 347 U.S. 590, 597-598 [74 S.Ct. 757, 98 L.Ed. 967].) A state, however, may not impose a tax which unduly burdens interstate commerce. (*Martin Ship Service Co.* v. *City of Los Angeles,* 34 Cal.2d 793, 796 [215 P.2d 24].) " 'Interstate business must pay its way' (*Western Live Stock* v. *Bureau of Revenue,* 303 U.S. 250, 254 [58 S.Ct. 546, 82 L.Ed. 823, 115 A.L.R. 944], provided it does not pay too much or too often." (*Martin Ship Service Co.* v. *City of Los Angeles, supra,* at p. 796.)

That appellant in this case has not paid "too much" is implicit in its abandonment of claim of violation of due process, and it can protest that it must pay "too often" only if the transaction had been taxed in another state or if there

were risk, reasonably anticipated, of double or multiple taxation. There has been no tax by either of the other two states in which the railroad operates, and there is no reasonable probability or prospect that another use tax will be claimed. From the date of the sale to the date of oral argument of this appeal, at which time it was conceded that no tax was being claimed by another state, over ten years elapsed. The State of Nevada had no use tax statute until some three years after the transaction. As to the State of Utah, crane no. 89 was in that state but 11 days in 1952, and was not there at all in 1953 or 1954; crane no. 90 was not used in Utah at all in the year 1952, but was used in that state at times in 1953 and 1954. Meanwhile, substantial use of both cranes had been made in California, demand for use taxes was made on July 14, 1953, and the taxes were paid on September 3, 1953, to this state. It is extremely unlikely, under all of the circumstances, that the State of Utah will make any claim for use tax arising out of the 1952 transaction. If appellant is apprehensive of multiple taxation, it hears an alarm bell that has not rung.

### Taxable Moment in California

 We now inquire whether there existed such local incident as to create a "moment of taxation" in California. The concept of a taxable moment which exists when things reach the end of their interstate transportation and have not yet begun to be used in interstate operation, was expressed in Southern Pac. Co. v. Gallagher, 306 U.S. 167 [59 S.Ct. 389, 83 L.Ed. 586]. The application of the tax in that case was to office supplies, rails, equipment, machinery, tools, etc., but no rolling stock was involved. In Atchison, Topeka & Santa Fe Ry. Co. v. State Board of Equalization, 139 Cal.App.2d 411 [294 P.2d 181], the court upheld the use tax as applied to switch engines which had been bought in Iowa, used in Iowa and other states than California for an average period of 43 days, and then hauled into California "dead in train" where they remained permanently, engaged chiefly in interstate commerce, although a small proportion of their work was exclusively in intrastate commerce. There had been no sales or use tax by any other state. Appellant argues that there are the following distinctions between the Santa Fe case and the one before us: (1) In Santa Fe, the switch engines were permanently assigned to and permanently used in California, while in the

instant case there has been no such assignment to a single state, and each unit has been used in two, and one of them in three, states during the period of six months which is taken by the administrative branch as the relevant period. (2) In the *Santa Fe* case, the use prior to importation into California was because of shortage of power for yard work, and the destination for permanent use in California was unchanged, but in this case the units were employed in Utah and Nevada, prior to entry into California, according to the general plan to use them wherever needed.

It is true that the factual distinctions exist, as appellant asserts they do. We believe, however, that they do not make a difference in the result.

In the delicate balancing of the right of persons and corporations engaged in interstate commerce to be free from direct and undue burdens imposed by a state and the right of a state to impose a nondiscriminatory tax upon local incidents of commerce which in general is interstate, practicalities take precedence over mere labels. (*Interstate Oil Pipe Line Co.* v. *Stone,* 337 U.S. 662 [69 S.Ct. 1264, 93 L.Ed. 1613].) The "taxable moment," we take it, is not merely a fleeting interval in the flow of commerce wherein the alert tax collector may detect a pause, but such a break, whatever its duration, as may truly justify the state in levying a fair tax, not exceeding that imposed on domestic transactions.

The vice of cumulative taxation not being present, the brief use of the cranes prior to their entry into California, in Nevada which had no use tax, and in Utah, which has never claimed any, may be regarded as a "formal use" under these circumstances. Formal use in another state need not prevent imposition of the use tax. (*Atchison, Topeka & Santa Fe Ry. Co.* v. *State Board of Equalization, supra,* 139 Cal.App.2d at p. 423.) Nor do we believe the fact that the cranes were used in other states after their extensive use in California obliterates the taxable moment which existed here, where no other state has asserted taxability of the use. The board's rule making one half of the six-month period after entry the test of taxability appears reasonable, fair, and practicable. Assignment on the books of the company appears rather unimportant, the test being rather the actual occurrences.

The use tax is essentially a compensating one, to

make up for the loss of the sales tax which would apply on intrastate transactions. These cranes, by being stored (which means being kept for any purpose except sale [Rev. & Tax. Code, § 6008]), and used (which means the exercise of any right or power incident to ownership except sale [Rev. & Tax. Code, § 6009]), may cause certain burdens to be borne by the State of California, such as police and fire protection, the use of courts in respect of claims, etc. If they are exempt from paying the use tax in California, they will have escaped this particular tax, the compensating use tax, completely. By their very nature and functions, the cranes, although technically "rolling stock," do not haul trains, nor assemble trains as switch engines do, but are auxiliary to interstate and intrastate operations inextricably. If it is fair that interstate commerce "must pay its way" (*Martin Ship Service Co.* v. *City of Los Angeles, supra,* 34 Cal.2d at p. 796), it is fair that these instruments of both kinds of commerce should do so. If they did not, unfairness to intrastate sales transactions would result. There seems, under all of the circumstances of this case, an aptness to the words of Justice Cardozo in a decision sustaining a state use tax: "When the account is made up, the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates." (*Henneford* v. *Silas Mason Co.,* 300 U.S. 577, 584 [57 S.Ct. 524, 81 L.Ed. 814].)

*Effect of Administrative Code Section 2015 Subdivision (b)*

Appellant argues that section 2015 subdivision (b) of the Administrative Code of this state, quoted above, precludes the tax. We regard this administrative rule as merely stating that interstate commerce will not be taxed when it cannot be taxed. The rule is not a limitation on section 6202 of the Revenue and Taxation Code, which imposes the use tax. Therefore, the administrative rule adds nothing to the claim, heretofore considered, of invalidity of the levy on interstate grounds. (*Atchison, Topeka & Santa Fe Ry. Co.* v. *State Board of Equalization, supra,* at p. 415.)

Judgment affirmed.

Draper, P. J., and Salsman, J., concurred.