## W. R. GRACE & CO., DAVISON CHEMICAL DIVISION *v.* COMPTROLLER OF THE TREASURY, RETAIL SALES AND USE TAX DIVISION

[No. 22, September Term, 1969.]

*Decided November 11, 1969.*

The cause was argued before MARBURY, ▉ BARNES, MC-WILLIAMS, SINGLEY and SMITH, JJ.

*Francis D. Murnaghan, Jr.*, with whom were *Joseph H. H. Kaplan* and *George Cochran Doub, Jr.*, on the brief, for appellant.

*Jon F. Oster, Assistant Attorney General*, with whom was *Francis B. Burch, Attorney General*, on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The appellant, W. R. Grace & Co., Davison Chemical Division (Grace), petitioner below, challenges the validity of an assessment for use taxes by the appellee, Comptroller of the Treasury, Retail Sales & Use Tax Division, upon two airplanes owned by Grace and used by it regularly and exclusively for the transportation of passengers and property, primarily executives and customers of Grace, across state lines and national boundaries to various Grace plants throughout the North American continent. Grace, a Connecticut corporation, operates its Davison Chemical Division in Maryland. The assessment was made by a notice from the Comptroller dated July 12, 1966, for the period June 14, 1961, to March 8, 1966, in the aggregate amount of $33,481.60, including interest and penalties. The Comptroller's hearing officer, following a hearing on December 1, 1966, filed an opinion dated March 28, 1967, sustaining the assessment.

The Maryland Tax Court by its order of June 27, 1968, affirmed the Comptroller's determination. On appeal to the Baltimore City Court (Sodaro, J.), the decision of the Maryland Tax Court was affirmed by an opinion and order filed January 22, 1969. A timely appeal was taken from the order of January 22, 1969, to this Court.

There is no dispute in regard to the essential facts. Grace, by purchase orders dated in October, 1960, and February, 1961, ordered an Aero Commander from Aero Design and Engineering Co., Bethany, Oklahoma, through its distributor Holladay-Aero, Inc. of Arlington, Virginia. The purchase price was $119,557. Certain electronic installations were made on the airplane at the maintenance shop of Holladay-Aero at Byrd Field, Richmond, Virginia at a cost of $42,295. George W. Welsch, a pilot for Grace, took delivery of the Aero Commander on June 19, 1961, at Byrd Field, Richmond, Virginia and flew it to White Sulphur, West Virginia on the business of Grace. On the same day, the airplane was flown on company business to Owensborough, Kentucky and to Baltimore, Maryland. The following day, June 20, it was flown to Richmond, Virginia, Tri-City, Tennessee and Denton, Ohio. On June 21 it was flown to Baltimore, Maryland and on June 22 to Watertown, New York and Mingan, Province of Quebec, Canada. The lower court found that this airplane "has since been used regularly and exclusively in transporting property and passengers, primarily executives and customers of Grace, across state lines and national boundaries to various Grace plants throughout the continent."

The logs of the Aero Commander were introduced into evidence and showed that almost every flight of the airplane occurred between airports of different states. During the period of assessment, June 14, 1961, to March 8, 1966, the airplane made successive take-offs and landings at the same airport in Maryland on only five occasions and these five occasions related to the testing and training activities incidental to the interstate and international use of the airplane. Only six flights involved

successive take-offs and landings at two airfields within Maryland and on five of those six occasions, the landings constituted an immediate part of an interstate flight. There was only one occasion, August 28, 1963, during the entire five-year period of assessment, when the airplane made a round trip between Ocean City, Maryland and Friendship Airport in order to transport one of the employees of Grace to and from a conference in Baltimore City. The portions of the interstate and foreign flights of the airplane which occurred in Maryland ranged from between 25 and 155 miles and between 15 and 40 minutes, depending upon the direction of the flight.

In 1965, Grace acquired a company engaged in the sale of seeds. Most of the locations of the newly acquired company were located west of the Mississippi River, some being in the far West and on the West Coast. Grace then decided to purchase a second airplane in order to service these more distant locations. By purchase order agreements dated May 24 and September 3, 1965, Grace ordered from Aero Commander, Division of Rockwell-Standard Corporation, Bethany, Oklahoma, through its distributor Reading Aviation Service, Inc., an Aero Jet for the purchase price of approximately $609,500. Certain electronic equipment was installed by Reading Aviation Service, Inc. at Reading, Pennsylvania at a cost of $179,700. The purchase price was paid by checks to the seller, dated June 3 and November 4, 1965; the installation costs were paid to Reading Aviation Service, Inc. by checks dated December 15, 1965, and March 8, 1966.

After the Aero Jet was manufactured in Oklahoma City, Oklahoma, it was transferred sometime around November, 1965, to Reading Aviation Service in Reading, Pennsylvania for several months during which installation work was performed and test flights made, including interstate flights. During the period of the assessment, the Aero Jet entered Maryland on only four oc-

casions—February 7, 13, 21 and 23, 1966. On the first three occasions, the airplane was flown by a Mr. Bertolet from Reading, Pennsylvania to Baltimore, where Mr. Welsch either embarked or disembarked and immediately on the same day the aircraft was returned to Reading, Pennsylvania. On the fourth occasion the airplane was flown from Reading to Baltimore and on the same day continued to Oklahoma City. Prior to April 6, 1966, the date of delivery of the airplane, the Aero Jet had entered Maryland on only three other occasions, *i. e.,* on March 9, 10 and 11, 1966; and each of these flights was part of an interstate flight. All of these flights were test flights as an aftermath of which, because of certain matters not satisfactory to Grace, the aircraft was returned to the factory at Oklahoma City for various adjustments. After the adjustments were made, Grace through Mr. Welsch took delivery at Oklahoma City on April 6, 1966.

The lower court found that the Aero Jet after its delivery to Grace "was employed regularly and exclusively in interstate and foreign commerce in the transportation of passengers and property of W. R. Grace." On four occasions, the airplane took off and landed at the same airport but this occurred only at the Reading, Pennsylvania airfield. On each occasion that the Aero Jet took off from an airfield in Maryland, the immediately successive landing occurred in another State and on every occasion on which it landed in Maryland the immediately preceding point of departure took place outside of Maryland. The Maryland portions of interstate and foreign flights of the Aero Jet ranged from between 25 and 155 miles and between 5 and 20 minutes depending upon the flight directions.

All major maintenance work performed for both airplanes has been conducted exclusively at Oklahoma City, Williamsport, Pennsylvania, or Reading, Pennsylvania. Fuel for their operations has been purchased from time to time at various airports located throughout the United States. Although certain minor maintenance work has

been performed at Friendship Airport near Baltimore, this same type of work is performed at airports in all other States when found to be necessary. There was testimony that it was estimated that the airplanes are used for company business approximately 20 days out of each month. On days not used, they are left at Friendship Airport.

Grace advances three propositions before us:

1. During the period of the assessment, the two airplanes were used exclusively as instruments of interstate commerce and the privilege of such use is not subject to local taxation.

2. As properly construed, the language of the Comptroller's Rule 64 (c) exempts the airplanes from taxation.

3. The imposition of the use tax on the two airplanes, when other carriers are afforded an exemption for the use of vehicles in interstate commerce, would deny Grace the equal protection of the laws as prohibited by the Fourteenth Amendment to the Constitution of the United States.

As we agree with the first two propositions of Grace, we shall reverse the order of the Baltimore City Court without finding it necessary to pass upon the interesting arguments urged upon us in regard to the third proposition.

1.

We have concluded that during the period of the assessment, the two airplanes were used exclusively as instruments of interstate commerce and the privilege of such use is not subject to local taxation because of the provisions of Article 1, Section 8, Clause 3 of the Constitution of the United States giving Congress the power to "regulate commerce with foreign nations and among the several States" and the cases construing this constitutional provision.

It should be observed, *in limine,* that although there was some suggestion in the opinion of the Maryland Tax

Court that the transactions in the acquisition of the two airplanes were subject to the Maryland sales tax, this possible issue was apparently not pressed by the Comptroller before the lower court and was not passed upon by it. Nor was it briefed or argued by the Comptroller before us so that we deem that possible issue waived. Maryland Rule 831 c 2, 4. See *Harmon v. State Roads Commission,* 242 Md. 24, 217 A. 2d 513 (1966).

In any event, it is clear to us that the sales tax had no application to the purchase of the two aircraft inasmuch as the evidence demonstrates that the delivery of the Aero Commander was taken at Richmond, Virginia and the delivery of the Aero Jet was taken in Oklahoma. The evidence also establishes that both airplanes were ordered directly from a *non-resident vendor,* not from a place of business of the vendor in Maryland but from the non-resident vendor's place of business in Oklahoma. The last section of the Comptroller's Rule 64 provides that under these circumstances, the sales tax would not be applicable even if delivery of the aircraft had been made by the seller in Maryland. The applicable portion of the Rule provides:

> "* * * if a Maryland purchaser orders goods directly from a non-resident vendor who maintains no place of business in this State, the sales tax does not apply to goods sold pursuant to the order if they are shipped into Maryland from points outside thereof. However, it must be borne in mind that such sales may be subject to the Use Tax."

The question before us is, therefore, whether or not the *use tax* applies. The Maryland Use Tax, Code (1957), Art. 81, §§ 372-401, and the Maryland Retail Sales Tax, Art. 81, §§ 324-371 are complementary. See *Comptroller of the Treasury v. American Cyanamid Co.,* 240 Md. 491, 502-503, 214 A. 2d 596, 602-603 (1965) and cases therein cited.

Art. 81, Sec. 375 provides for the following exemption of the use, storage or consumption of tangible personal property in Maryland from the Maryland Use Tax:

> "(b) Tangible personal property expressly exempted from the retail sales tax imposed by this State under the terms and provisions of § 326 of this article."

By virtue of Art. 81, Sec. 326 the following exemption from the sales tax is provided:

> "(f) Sales which are not within the taxing power of this State under the Constitution of the United States."

In considering the validity of local taxation under the Commerce clause of the United States Constitution, the nature of the tax must be considered. If properly apportioned, a *property tax* may be imposed upon a commercial aircraft which merely lands or takes off within the taxing state on regular and repeated scheduled flights. *Braniff Airways, Inc. v. Nebraska State Board of Equalization,* 347 U. S. 590, 74 S. Ct. 757, 98 L. Ed. 967 (1954). The tax being apportioned, merely requires interstate commerce to bear its fair share of the local tax burden and is not an "undue burden" on interstate commerce. As pointed out by Mr. Justice Reed in *Braniff,* apportionment of the *property tax* is still generally required, notwithstanding the decision of the Supreme Court in *Northwest Airlines v. Minnesota,* 322 U. S. 292, 64 S. Ct. 950, 64 L. Ed. 1283 (1944), which, in effect, is confined to the facts in that case, there being no majority of the Supreme Court agreeing on any one theory for sustaining the application of the general State property tax in that case to aircraft having a "home port" in Minnesota and there being no evidence that the aircraft was taxable in any other State. After the decision in *Northwest Airlines,* the State amended its statute to provide for *apportionment of the property tax.*

See also *Standard Oil Co. v. Peck,* 342 U. S. 382, 384, 72 S. Ct. 309, 96 L. Ed. 427 (1952) and the comment of Mr. Justice Douglas in regard to *Northwest Airlines.*

A local use tax, however, is not imposed upon the article itself nor upon its sale, but upon the *privilege* of using, storing or consuming the article in question within the State. *Lane Construction Corp. v. Comptroller of the Treasury,* 228 Md. 90, 94, 178 A. 2d 904, 906 (1962). Use taxes may not, therefore, be constitutionally imposed upon the privilege of engaging in an aspect of interstate commerce, but may only be imposed if the article to be taxed is employed in a separate local activity. The applicable law is well summarized by Mr. Justice Clark in *Michigan-Wisconsin Pipe Line Co. v. Calvert,* 347 U. S. 157, 166, 74 S. Ct. 396, 401, 98 L. Ed. 583, 591 (1954) as follows:

> " 'It is now well settled that a tax imposed on a local activity related to interstate commerce is valid if, and only if, the local activity is not such an integral part of the interstate process, the flow of commerce, that it cannot realistically be separated from it.' " *Michigan-Wisconsin Pipe Line Co. v. Calvert,* 347 U. S. 157, 166 (1954). See also e.g., *Joseph v. Carter and Weeks Stevedoring Co.,* 330 U. S. 422 (1947).

In *Michigan-Wisconsin Pipe Line Co. v. Calvert, supra,* the Supreme Court held invalid a tax upon the privilege of "gathering" gasoline within the State, because the activity upon which the tax fell, *i.e.,* receiving gasoline into the taxpayer's interstate pipe line, was not sufficiently separable from the interstate activity.

In an earlier Supreme Court case, *Helson & Randolph v. Kentucky,* 279 U. S. 245, 49 S. Ct. 279, 73 L. Ed. 683 (1929) involving the validity of a state tax upon the sale of gasoline to be used within the State by a ferry boat engaged in interstate commerce and in which the Supreme Court held that the application of the tax was an

invalid burden upon interstate commerce. Mr. Justice Sutherland stated:

> "The tax is exacted as the price of the privilege of using an instrumentality of interstate commerce. It reasonably cannot be distinguished from a tax for using a locomotive or a car employed in such commerce. A tax laid upon the use of the ferry boat, would present an exact parallel. And is not the fuel consumed in propelling the boat an instrumentality of commerce no less than the boat itself? A *tax, which falls directly upon the use of one of the means by which commerce is carried on, directly burdens that commerce.* If a tax cannot be laid by a state upon the interstate transportation of the subjects of commerce, as this Court definitely has held, it is little more than repetition to say that such *a tax cannot be laid upon the use of a medium by which such transportation is effected.*" (Emphasis supplied.) *Id.,* 279 U. S. at 252, 49 S. Ct. at 281, 73 L. Ed. at 687.

The Supreme Court of the United States has held that under certain circumstances tangible personal property, such as replacement parts for equipment used in interstate commerce, may be subjected to a local use tax imposed upon the storage of such property within the State prior to its entry into the stream of commerce. *Southern Pacific Co. v. Gallagher,* 306 U. S. 167, 59 S. Ct. 389, 83 L. Ed. 586 (1939). In the *Southern Pacific* case, the local use tax was held to be applicable solely because after the purchase and arrival within the taxing state of the replacement parts to be used on railway equipment, there was a period of storage which was sufficient to constitute a "taxable moment" sufficient to support the local tax. Mr. Justice Reed, stated for the Supreme Court:

> "The principle illustrated by the *Helson* case forbids a tax upon commerce or consumption in

commerce. The *Wallace* case, and precedents analogous to it, permit state taxation of events preliminary to interstate commerce. The validity of any application of a taxing act depends upon a classification of the facts in the light of these theories."

\* \* \*

"We think there was a taxable moment when the former had reached the end of their interstate transportation and had not begun to be consumed in interstate operation. . . . The interstate movement was complete. The interstate consumption had not begun."

(*Id.*, 306 U. S. at 176, 177, 59 S. Ct. at 393, 83 L. Ed. at 593)

This "taxable moment," however, must be a clearly distinguishable termination of the interstate movement and a *separate local activity* prior to the rededication of the property to interstate commerce. As the District Court of Appeals of California stated in *Western Pacific Railroad Co. v. State Board of Equalization,* 213 Cal.App.2d 20, 27, 28 Cal. Rptr. 453, 457 (1963) :

"The 'taxable moment,' we take it, is not merely a fleeting interval in the flow of commerce wherein the alert tax collector may detect a pause, but such a break, whatever its duration, as may truly justify the state in levying a fair tax. . ."

See also *American Airlines, Inc. v. State Board of Equalization,* 216 Cal.App.2d 180, 30 Cal. Rptr. 590 (1963) holding that the use tax of California was applicable to airplane replacement parts brought into the State and stored there *prior* to their incorporation on aircraft engaged in interstate commerce, in which the Court stated :

"Under the circumstances of this case no use tax was possible after the storage and installa-

tion in an instrumentality of interstate commerce or storage and reentry into interstate commerce in California, for the reason that the personal property was consumed in interstate commerce. At the very moment when the tax was applied however in California the personal property had come to rest in this state and was not being put to use in interstate commerce." (*Id.*, 216 Cal.App.2d at 193-4, 30 Cal. Rptr. at 598)

The fact that an instrument of interstate commerce is brought into a state and for a short period of time is not actively engaged in, or being used or consumed in, interstate commerce because temporarily standing still and inactive, does not constitute a withdrawal of that instrument from interstate commerce. See *Union Pacific Railroad Co. v. Utah State Tax Commission*, 110 Ut. 99, 169 P. 2d 804 (1946), involving several railroad engines formerly used in switching and hauling interstate cars in Nebraska and subsequently brought to Salt Lake City for a similar type of use.

Before the Maryland Tax Court and the lower court, the Comptroller argued successfully that because Grace did not exact a passenger fare or a freight charge for the use of the airplanes, the limitation arising from the commerce clause on the taxing power of the State does not apply. The Comptroller also contended below and in this Court that Comptroller's Rule 64, as properly construed, comprehends a public conveyance and hence does not exclude airplanes used by a taxpayer in its business to transport its executives, employees and customers to business meetings and other business locations. As will be pointed out later in this opinion, we do not agree with this construction of Comptroller's Rule 64.

In our opinion the attempted distinction between instrumentalities used in interstate commerce for which fares or charges are made and such instrumentalities for which fares or charges are not made is not supported by

the authorities. It appears to us that there is no such distinction.

As early as 1824 when the Supreme Court of the United States decided the landmark case of *Gibbons v. Ogden*, 9 Wheat. 1 (22 U. S.), the Supreme Court indicated that the word "commerce" was not restricted to traffic, buying and selling or the interchange of commodities, but was a broader term. Chief Justice Marshall stated:

> "The subject to be regulated is commerce; and
> . . .it becomes necessary to settle the meaning
> of the word. The counsel for the appellee would
> limit it to traffic, to buying and selling, or the
> interchange of commodities, and do not admit
> that it comprehends navigation. This would re-
> strict a general term, applicable to many ob-
> jects, to one of its significations. Commerce,
> undoubtedly, is traffic, but it is something more:
> it is intercourse. It describes the commercial in-
> tercourse between nations, and parts of nations,
> in all of its branches, and is regulated by pre-
> scribing rules for carrying on that intercourse."
> (9 Wheat. at 189-190)

In *Heart of Atlanta Motel, Inc. v. United States*, 379 U. S. 241, 85 S. Ct. 348, 13 L.Ed.2d 258 (1964), the Supreme Court, speaking through Mr. Justice Clark stated:

> " 'The transportation of passengers in interstate
> commerce, it has long been settled, is within the
> regulatory power of Congress, under the com-
> merce clause of the Constitution, and the au-
> thority of Congress to keep the channels of in-
> terstate commerce free from immoral and inju-
> rious uses has been frequently sustained, and is
> no longer open to question.' [*Caminetti v.
> United States*, 242 U. S. 470, 491 (1917)] . . .
> *Nor does it make any difference whether the
> transportation is commercial in character.*"
> (Emphasis supplied.)

(379 U. S. at 256, 85 S. Ct. at 357, 13 L.Ed.2d at 267-8)

In sustaining and applying the Federal White Slave Act, the United States District Court for the Northern District of California stated in *United States v. Burch*, 226 F. 974, 975-976 (1915) :

> "[T]he transportation of persons has long been held to be commerce. Interstate commerce then is, among other things, the passage of persons or property from one state to another. *It does not necessarily, or indeed at all, involve the idea of a common carrier, or the payment of freight or fare.*" (Emphasis supplied.)

See our decision in *Atlantic, Gulf & Pacific Co. v. State Department of Assessment and Taxation*, 252 Md. 173, 249 A. 2d 180 (1969) in which we considered the broad meaning of the word "commerce" as used in Code (1957), Art. 81, Sec. 9 (26).

It cannot be reasonably contended in the present case that the transportation by the two airplanes was "free." What Grace has done, in effect, has been to expend its funds for the use of the two aircraft in lieu of the cost for similar transportation it would have purchased piecemeal from commercial carriers. The intention is to obtain better and more direct service to its far flung operations, many of which are somewhat removed from the routes of commercial carriers.

The Comptroller urged upon us that because the aircraft were based at Friendship, they were "stored" in Maryland and were, therefore, subject to state taxation. In our opinion, however, the airplanes are not "stored" at Friendship Airport. "Storage" connotes the removal of the object from service. The evidence in the present case indicates that the airplanes are in constant service and are used whenever the business of Grace requires that use. All physical equipment used in interstate commerce must, of necessity, be temporarily out of such use

from time to time, if for no other reason than to be refueled, repaired and maintained. The aircraft of commercial airlines are regularly placed in hangars at Friendship Airport and, indeed, are "based" in Maryland, yet the Comptroller has conceded that these aircraft have not been and are not subject to the Maryland use tax. Again, tractors and trailers of interstate traders are "based" at Maryland trucking terminals but have not been subjected to the use tax.

The lower court concluded that a "taxable moment," or separable local activity, existed in the present case apparently because of the testimony of one witness that the airplanes did not fly for approximately 10 days a month. This testimony, however, was an overall "estimate"; the logs of the two airplanes demonstrate that the days on which no flights occurred were rather evenly distributed throughout each month and that there was no fixed or regularly recurring 10 day period in each month. The mere cessation of flight and lapse of time between the flights of aircraft does not, in itself, indicate a withdrawal of the aircraft from interstate commerce. It is apparent that airplanes cannot be constantly in motion but must make stopovers from time to time. In order to sustain a local use tax, the intrastate event or "taxable moment" is not merely one of a series of such stopovers. As Mr. Justice Jackson of the Supreme Court of the United States aptly stated in *Railway Express Agency, Inc. v. Virginia,* 347 U. S. 359, 368, 74 S. Ct. 558, 563, 98 L. Ed. 757, 764 (1954) :

> "It is enough to say that we recently have ruled that local incidents such as gathering up or putting down interstate commodities as an integral part of their interstate movement are not adequate grounds for a state license, privilege or occupation tax."
>
> (citing four prior cases in the Supreme Court)

Nor, in our opinion, is the *one* instance of one of the airplanes making a trip to Ocean City, Maryland and

back to Friendship Airport during the entire five-year period of the assessment sufficient to change or impair in any way the interstate character of the use of the airplanes. The lower court correctly so held, as we have noted above.

In summary, it is our opinion that the two airplanes did not engage in any local activity which can be realistically separated from their use in interstate commerce. Hence the Comptroller's attempted application of the use tax cannot be sustained by reason of its repugnancy to the commerce clause of the United States Constitution and the provisions of the Maryland statutes, already mentioned, granting an exemption when this situation occurs.

2.

The Comptroller's Rule 64 (c) provides for an exemption for taxable items which are:

> " '. . .sold to a person regularly engaged in interstate or foreign commerce for incorporation into or use on or by their vehicles which transport or move either passengers or property across state lines or in foreign commerce. Sales of vehicles which will regularly transport passengers or property across State lines or in foreign commerce are also exempt.' "

As we have already set forth in this opinion, the two aircraft involved in the present case have been engaged exclusively in the transportation of persons and property across state lines and in foreign commerce and the lower court so determined. This use in interstate commerce obviously falls precisely within the exact language of Rule 64 (c). The Comptroller, however, contended below and before us that this exemption was designed for vehicles which regularly move or transport passengers or property in interstate commerce *only* if such passengers or the property owners *pay a fare or charge for the transportation service*. The testimony of the late Edward

F. Engelbert, who had been either Assistant Director or Director of the Sales and Use Tax Division since the adoption of the Sales and Use Tax statutes and who had been active in the preparation of Rule 64, was taken over the objection of counsel for Grace in regard to the intentions of the Comptroller in preparing Rule 64. This testimony included a recitation of the possible undesirable economic impact of the sales and use tax on certain industries in the Baltimore area; the attempt of the Comptroller to eliminate the undesirable economic impact on those industries, but with an effort upon Mr. Engelbert's part to restrict the exemption as much as possible; and, the extraordinary suggestion that Rule 64 was probably unconstitutional in any event.

We have grave doubts concerning the admissibility of this testimony in view of our prior decisions, but we do not find it necessary to rule upon the question of the admissibility of this evidence because, assuming *arguendo*, that it would be admissible, there was no prejudice in the instant case to Grace by its admission. In our opinion the provisions of Rule 64 are clear and unambiguous and do not make the distinction for which the Comptroller contends. In effect, the Comptroller would have us add after the words "foreign commerce" in Rule 64 (c), by construction, the words "for the transportation of which a fare or charge has been made and paid." The short answer to this is that the Comptroller did not see fit to add these words to the rule and we are not at liberty to make such an addition by construction. *Atlantic, Gulf & Pacific Co. v. State Department of Assessment and Taxation*, 252 Md. 173, 181, 249 A. 2d 180, 185, *supra*. The words of the rule apply to *all* passengers or property transported or moved across state lines or in foreign commerce regardless of whether a fare has been paid or a charge made. These words being clear and unambiguous, their effect may not be modified by any administrative construction to the contrary however long continued. *Id.*, 252 Md. at 183, 249 A. 2d at 186.

Nor is it our opinion that Rule 64 is unconstitutional.

It would be indeed unconstitutional if the Comptroller's attempted construction were made (and this is an excellent reason for not adopting his attempted construction) because, as we have pointed out, the distinction he urges is not a constitutionally viable one under the authorities already mentioned. The Comptroller's Rule 64, in our opinion, is in accord with the applicable Federal Constitutional requirements and effectively grants the required exemption from Maryland sales and use taxes to "vehicles which transport or move either passengers or property across state lines or in foreign commerce." Inasmuch as the two airplanes of Grace fit precisely within the exemption in Rule 64 (c), they are also exempt from the use tax sought to be imposed by virtue of the provisions of Rule 64 (c).

> *Order of January 22, 1969, affirming the assessment of the appellee Comptroller of the Treasury, Retail Sales & Use Tax Division dated July 12, 1966, reversed, the assessment of the Comptroller of the Treasury abated, and the appellee to pay the costs.*