CRAFTSMAN PRESS, INC. *v.* COMPTROLLER
OF THE TREASURY

[No. 1288, September Term, 1981.]

*Decided July 9, 1982.*

The cause was argued before MOYLAN, MASON and LISS, JJ.

*Martin Shulman* for appellant.

*Linda Koerber Boyd, Assistant Attorney General,* with

whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

Liss, J., delivered the opinion of the Court.

This is an appeal by Craftsman Press, Inc. (Craftsman), appellant, from an order of the Circuit Court for Prince George's County affirming the decision of the Maryland Tax Court which upheld an assessment for sales taxes made by the Comptroller of the Treasury of the State of Maryland, appellee herein, against the appellant for the period ranging from 1971 to 1973.

Craftsman, a commercial printer in Bladensburg, Maryland, produces printing by means of "offset" or "photo-" lithography, a process whereby a photograph is taken of "camera-ready" images. Camera-ready compositing work ("repro's") is prepared on sheets of paper by compositors from drafts supplied by Craftsman's customers. The image from the photographic negative is transferred onto a metal plate, the plate is placed on a printing press, and printed work is then produced.

At the hearing in the Tax Court, Craftsman's president, Mr. Arnold R. Altshuler, testified for Craftsman and was qualified as an expert witness in lithography and printing.

Most importantly, from a historical viewpoint, Mr. Altshuler testified that photo-lithography started to become the principal method of printing in the United States about 35 years ago, *i.e.,* just about the time that Maryland's Retail Sales Tax Act was adopted. Prior to lithography, Mr. Altshuler testified, compositors made no retail sales of tangible personal property to printers, but merely transferred physical metal to printers on a temporary basis, to be used in producing "letterpress" work. After the metal image created by the compositor was used in the letterpress printing process, the metal was returned to the compositor and melted down for reuse by him. What the printer therefore obtained from the compositor was temporary custody of a composed typographic image to be reproduced by letterpress printing.

Mr. Altshuler testified that in the lithographic process, instead of transferring heavy metal between compositor and printer, the compositor prepares a piece of paper bearing the image he has created, the piece of paper being known as a "repro." The image used in lithographic printing is transferred to the printer through the medium of the sheet of paper constituting the "repro." The present state of the printing and compositing arts, however, is such that transferring physical pieces of paper is not necessary: image transfer can take place directly from the compositor to the metal lithographic printing plate without intervening paper or a photographic step.

Mr. Altshuler testified as an expert that in his opinion a typographer's providing compositing to a printer is "basically a service. . . . What we are buying is his know-how in putting his style together." It was uncontradicted that Craftsman and other printers are not billed by compositors for any tangible product; they are billed exclusively for the labor creating the image produced by the compositor. The compositor's bill is therefore measured by the amount of typesetting ("ems") on a page, not the number of paper "repros." The cost of the compositing therefore varies with the nature of the composition and the difficulty or amount of craftsmanship which goes into making a particular image. Mr. Altshuler testified that "it takes a whole line of skills . . . to make that image" and that the culmination of the compositor's "skill and craftsmanship" results in the image which becomes the "repro." Craftsman contended that it had never been billed for physical pieces of paper or ink that constitute a "repro," but only for the work used to create the typographic images. The image produced is the essence of the typographer's work. Once camera-ready copy is photographed, the copy or "repro" is destroyed. The appellant argued that it is the typographic image itself which gives the "repro" its entire worth; after a picture is taken of the "repro," it is not worth anything.

The case originally arose from an assessment of Craftsman made by the Retail Sales Tax Division of the Comptroller of the Treasury of a deficiency in sales tax.

Craftsman contested the assessment following the required administrative procedure which culminated in a formal hearing and a written opinion by the Hearing Officer dated April 30, 1979. That opinion determined that the purchase of "repros" by Craftsman was a transaction subject to sales tax and denied Craftsman's application for revision of the assessment. The Hearing Officer upheld the assessment in the amount of $33,867.32 plus penalty and interest.

Craftsman appealed to the Maryland Tax Court which held a trial *de novo.* The Tax Court by Order and Memorandum dated February 21, 1980, affirmed the assessment. A further appeal was then filed in the Circuit Court for Prince George's County which resulted in an order affirming the judgment of the Tax Court. It is from that order that this appeal was filed. The following issues are raised by this appeal:

1. Were "repros" produced in the performance of compositing services subject to payment of sales tax as tangible personal property?

2. Was the Comptroller of the Treasury legally correct in his revision of the original Rule 30?

3. Should either penalty or interest or both imposed on the sales tax assessment be abated?

### 1. and 2.

The assessment against Craftsman was made under the authority of the Comptroller's revised Rule 30, which was in effect from May 13, 1971 through June 30, 1973. The original Rule 30 was adopted by the Comptroller at the time of the enactment of the Retail Sales Tax Act in 1947. Rule 30 was drafted by a committee which in considering this industry and others was charged with the responsibility, as phrased by Mr. Richard Engelbert, former Chief of the Retail Sales Division, of placing regulatory meat on the Sales Tax Act skeleton. As a result of the committee's labors, Comptroller's Rule 30 was adopted. It provided in pertinent part as follows:

The sale of typography, art work, photo-engravings,

electros, mats, stereotypes, hand or machine com-
positions, lithographic plates or negatives,
electrotypes, etc. to a person engaged in printing of
tangible personal property and to be used directly
by such person shall be deemed essentially sales of
services and not taxable. The supplier of the service
is deemed the consumer of all material used in sup-
plying such service, and must pay the tax to his
vendor.

Mr. Engelbert testified that he had served in the Retail
Sales Tax Division of the Comptroller's office since 1947 and
that Rule 30 had been adopted even before the effective date
of the Act. He stated that the purpose of Rule 30 was to
interpret the provisions of the Retail Sales Tax Act under
the Comptroller's statutory authority to define terms and
write rules and regulations. The Comptroller during the
entire period of the effectiveness of the original Rule 30 had
followed the position that compositing was a nontaxable ser-
vice for the reasons testified to by Mr. Engelbert when he
said,

[U]nder these rules any person who processes a
plate which he will use in his own printing oper-
ation or which he will sell to another person to be
used by him to print products for sale must pay the
tax on everything which he buys, but when the pro-
cessed plate is sold to a printer the supplier of the
plate is not required to collect the tax. This means
it doesn't make any difference who buys the raw
materials; tax is applied to the raw materials only
and not to the processed plate, which we have con-
sidered as a sale of service to the printer rather than
a sale of tangible personal property, the placing of
image on the property. This would be true whether
trade composition, art work, or any other form of
the placing characters on paper or paper-like sub-
stances.

These rules will differ from the Rule 63, for
example, which applies to general manufacturers.

Mr. Engelbert further testified that in 1955 legislation was introduced in the Maryland Senate for the purpose of creating new printing-related exemptions from the sales tax statute but including also a number of items already defined as exempt under Rule 30. That legislation failed and the Legislature left the original Rule 30 intact.

Effective May 13, 1971, the Comptroller's office revised Rule 30 completely reversing its original position. It adopted a revised Rule 30 which from May 13, 1971 to June 30, 1973 provided in pertinent part as follows:

> Sales to persons engaged in printing of typography, art work, photo-engravings, electros, mats, stereotypes, hand or machine composition, lithographic plates or negatives, electrotypes, etc., together with machinery, tools, equipment and replacement parts which are not incorporated into the finished product or destroyed in the printing process are taxable to the printer.

Despite the Comptroller's revision of Rule 30 in 1971, it is clear that the Comptroller remained of the view that a printer's purchase of typography involved a nontaxable transaction. As evidence of this position the Comptroller requested the advice of the Attorney General on a proposed *further* revision of Rule 30 as follows:

> The sale to all persons engaged in the printing of tangible personal property of typography, composition, reproduction proofs, photographic negatives, photoengravings, lithographic plates, electrotypes, stereotypes, mats, and art work, including layouts and paste-ups, and similar items will be considered sales of services and not taxable if: (1) the item is produced or designed on a special order for a specific printing job; (2) its value consists primarily of the services used to prepare an image which is to be reproduced in the printing process; (3) it is of inconsequential value for any purpose other than for the reproduction of the image contained on the

items; (4) it will be discarded after it is used in printing the material for which it was designed or produced. The supplier of such items will be considered to be selling services and will not be entitled to any of the exemptions from sales tax contained in Section 324(f) and must pay the tax on all tangible personal property purchased by him for use in supplying such services.

The Attorney General, in 51 Op. Atty. Gen. Md. 641, declined to approve the wording of the proposed second revision pending the Comptroller's providing additional information to support the further revision. In the light of this opinion a clarifying amendment codifying the original Comptroller's Rule 30, as it was in effect from 1947 until 1971, was placed on the agenda of the joint Budget and Audit Committee of the Legislative Council of the Maryland Legislature. The Comptroller was requested to state his position on the proposed legislation and the then Director of the Retail Sales Tax Division replied in a letter dated August 25, 1972, in which he stated in part:

> The amended rules which became effective May 13, 1971, were designed to, and we believe do, result in placing the printing industry on exactly the same footing as all other persons manufacturing, assembling, processing or refining tangible personal property for sale. They fully remedy the problem noted by the Maryland Tax Court, in that they accord the printing industry the benefits of the exclusion for property which is "destroyed" in the production of property for sale, and require the taxation of items of property on which other manufacturers presently pay the tax.

* * * * * * * *

> We can assure you that it was never our intention in amending these rules to affect the revenue structure of the sales tax and that the previous system

was not unsatisfactory to us other than the fact that there were serious questions raised as to its validity. Insofar as a legislative enactment would cure this defect, we are not opposed to returning to the previous treatment granted the printing industry.

A bill was prepared and introduced which reinstated the previous exemption under Rule 30; this bill was adopted by the Legislature and signed by the Governor adding Article 81 § 326(dd) which became effective July 1, 1973.

The basic statutory provision imposing a tax on sales of tangible personal property is found in Maryland Code (1957, 1980 Repl. Vol.) Article 81, § 325 (a) which states in part:

For the privilege of selling certain tangible personal property at retail as defined above and for the privilege of dispensing certain selected services defined as sales at retail by § 324 (f) of this subtitle a vendor shall collect from the purchaser a tax at the rate specified in this section. . . .

Transactions involving merely the provision of "services" are outside the scope of the sales tax. Only certain selected services defined as retail sales by § 324 (f) are subject to sales tax. Maryland Code (1957, 1980 Repl. Vol.) Article 81, § 326 (j) provides a specific sales tax exemption for "professional, insurance or personal service transactions which involve sales as inconsequential elements for which no separate charges are made." Article 81, § 365 (a) gives the Comptroller full authority "to make, adopt and amend such rules and regulations as he shall deem necessary to carry out the provisions of this subtitle and to define any terms used herein." It seems clear to us that this is what the Comptroller did when he adopted the original Rule 30. The Comptroller argues that the Act as adopted is not ambiguous and that it is clear that the compositing here involved is required to be subject to payment of the sales tax as the sale of tangible personal property.

We do not find the provisions of the Act as crystal clear as

suggested by the Comptroller. Section 325(a) provides that "services" are generally not subject to sales tax. Section 324 (f) (1)-(8) indicate that some transactions involving services are subject to tax. Nowhere is the term "service" as used in § 325 (a) or 326 (j) defined. No definition of the degree of sales permissible in § 326 (j) transactions without making these transactions subject to sales tax is set out in the Act. Even the terms "printing" as used in § 324 (f) (2) and "compositing" are not defined. It is obvious therefore that the original committee which prepared the necessary regulations was faced with a decision to determine whether "compositing" was a personal service transaction. The Comptroller, with the advice of his committee in reaching a definition of what he concluded was ambiguous terminology in the law, decided the transaction here discussed was the nontaxable "practice of graphic art" and not a taxable sale of tangible personal property. It was on the basis of this decision that he adopted the original Rule 30.

Webster's New International Dictionary 2d, Unabridged (1940) at p. 2228, defines the noun "service" as "performance of labor for the benefit of another." The Comptroller's own witness, Mr. Engelbert, in testifying concerning the application of Rule 30 over the 24-year period it was in effect said:

> We have considered as a sale of service to the printer the placing of image on the property. This would be true whether trade composition, art work, or any other form of the placing characters on paper or paper-like substances.

In the light of the patent ambiguity of the Sales Tax Act itself in the resolution of this issue it was appropriate for the Comptroller to adopt Rule 30 in the form he chose to adopt, *i.e.,* defining compositing as a service not subject to sales tax. The Supreme Court, in *Zenith Radio Corp. v. United States,* 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978) spoke of the deference to be given to administrative interpretation of a statute when it said:

> It is undisputed that the Treasury Department

adopted the statutory interpretation at issue here less than a year after passage of the basic countervailing-duty statute in 1897, see TD 19321, 1 Synopsis of [Treasury] Decisions 696 (1898), and that the Department has uniformly maintained this position for over 80 years.[10] This longstanding and consistent administrative interpretation is entitled to considerable weight.

"When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. 'To sustain [an agency's] application of [a] statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' " Udall v. Tallman, 380 U.S. 1, 16, 13 L Ed 2d 616, 85 S Ct 792 (1965), quoting Unemployment Compensation Comm'n v Aragon, 329 US 143, 153, 91 L Ed 136, 67 S Ct 245 (1946).

Moreover, an administrative "practice has peculiar weight when it involves a contemporaneous construction of a statute by the [persons] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." Norwegian Nitrogen Products Co. v. United States, 288 US 294, 315, 77 L Ed 796, 53 S Ct 350 (1933); see, e.g., Power Reactor Co. v Electricians, 367 US 396, 408, 6 L Ed 2d 924, 81 S Ct 1529 (1961).

In Maryland, as well, the Court of Appeals has held that the construction of the meaning of words placed upon a statute by administrative officials soon after its enactment

---

10. See, e.g., TD 19729, 2 Synopsis of Decisions 157 (1898); TD 20039, 2 Synopsis of Decisions 534 (1898) TD 43634, 56 Treas Dec 342 (1929); TD 49355, 73 Treas Dec 107 (1938).

should not be disregarded except for the strongest and most cogent reasons. *See Comptroller of Treasury v. M. E. Rockhill, Inc.,* 205 Md. 226, 107 A.2d 93 (1954).

The adoption of Rule 30 by a committee including the Assistant Attorney General who drafted the Sales Tax Act must be considered as a fully informed, authoritative interpretation of the statute so far as compositing was concerned. The subsequent administrative interpretation of the rule for some 24 years, the legislative history of the Sales Tax Act and the expression of the intent of the Legislature when it adopted § 326 (dd) convince us that it was the intent of the Act to treat compositing as a service and not as a sale. It was in our opinion improper for the Comptroller and the Tax Court to reverse the long-term administrative interpretation of the Rule unless the original rule could be shown to have been illegal, irrational or contrary to the legislative intent. *See Fribourg Navigation Co. v. Commissioner,* 383 U.S. 272, 86 S.Ct. 862, 15 L.Ed.2d 751 (1966); *American Oil Company v. Mahin,* 49 Ill.2d 199 (1971).

Counsel for the appellant has furnished us with a long list of authorities which indicate that in many states either by law or by regulation compositing is deemed a service and therefore not subject to a sales tax on the transfer of personal property. In other jurisdictions, the law similar to Maryland Code (1957, 1980 Repl. Vol.) Article 81, § 326 (j) holds that the paper "repro" is merely incidental to or an inconsequential part of compositing. The authorities, collected in the 1981 CCH All State Sales Tax Reporter, indicate that 16 states have held either by legislative action or by court decisions, that compositing is a service as that the furnishing of "repros" is merely incidental to the service, skill and artistic ability used in the preparation of such reproduction proof and therefore not subject to sales tax. Six other states hold that compositing is a service but found that their state law makes the service a specifically taxable one.

The trial judge affirmed the Tax Court because it inferred that the Court had implicitly found as a fact that compositing is tangible personal property within the

intendment of the Retail Sales Tax Act. We have carefully considered the decision of the Tax Court and find nothing in the record extract to support the conclusion of the trial judge. The Comptroller presented no witnesses on the issue whether compositing is tangible personal property. In contrast, the appellant presented two witnesses, acknowledged as experts, who gave credible testimony that the creation of the "repros" is a service. The uncontradicted testimony was that a compositor bills only for his labor and the president of the appellant testified that in the course of purchasing $3,000,000 worth of compositing over a 10-year period Craftsman had never been billed for any physical property, paper or ink but only for the labor or service expended in the compositing and that charges were based on the linear measure of the space involved in compositing and not for any physical property.

The Tax Court was required to give significant weight to the probative evidence before it and the only reliable evidence before the Court established that the compositing involved the rendering of a service. The Court, after proceedings that stretched over a period of five and one half years, chose to affirm the assessment by the Comptroller without any findings of fact and without any legal or factual explanation as to the method by which it reached its conclusion. We conclude the Tax Court's finding was not supported by the evidence and that the trial judge erred in affirming the Tax Court.

3.

In the light of our decision on the first and second issues, this issue is moot and we decline to address it.

> *Order of Circuit Court for Prince*
> *George's County reversed.*
> *Costs to be paid by Comptroller.*