528 A.2d 536

**CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF MARYLAND**

v.

**COMPTROLLER OF THE TREASURY.**

No. 1699, Sept. Term, 1986.

Court of Special Appeals of Maryland.

July 17, 1987.

Certiorari Granted Dec. 10, 1987.

**294**

Charles R. Moran and T. Scott Basik (Semmes, Bowen & Semmes, on the brief), Baltimore, for appellant.

Deborah B. Bacharach, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Linda Koerber Boyd, and Gaylin Soponis, Asst. Attys. Gen., on the brief), Baltimore, for appellee.

Argued before WILNER, ALPERT and ROBERT M. BELL, JJ.

WILNER, Judge.

Maryland imposes a 5% tax on the "use, storage or consumption in this State of tangible personal property purchased within or without this State...." Md. Code Ann. art. 81, § 373(a). The tax is commonly referred to as a "use tax."

The Chesapeake and Potomac Telephone Company of Maryland (C & P) paid that tax to the Comptroller on the cost of the telephone directories that it caused to be printed and distributed to its customers between October, 1977 and April, 1982. Asserting that it had paid the tax erroneously, C & P sought a refund, which, in major portion, the Comptroller denied. The Maryland Tax Court affirmed the Comptroller's denial of the claim for October, 1977—April, 1979 but ordered a refund for the May, 1979—April, 1982 period. On further review, the Circuit Court for Baltimore City affirmed the Tax Court's ruling on the 1977–79 claim but reversed on the 1979–82 claim, thereby effectively denying any refund beyond that granted by the Comptroller. The company is aggrieved and shall remain so.

## I. *Introduction—Issues*

The directories are those with which we are all familiar. Primarily, they contain the names, addresses, and telephone numbers of C & P subscribers in the geographic area to which they pertain. They also include information on how to use the telephone, how and where to make billing inquiries and obtain repair service, and other matters of interest to subscribers. The "yellow page" directories, as we know, contain business listings and advertising. C & P has divided the State into 26 geographic areas and prepares separate directories for each area. The directories are printed annually; they are distributed free to C & P subscribers, the cost being included in the charges for telephone service.

The directories at issue here were printed out-of-State. C & P compiled the data to be included in them and sent it to an independent compositor, who, in turn made a "camera ready" copy of it and sent that copy to printers selected by and under contract with C & P. Directories destined for subscribers in Garrett County and certain other rural areas of the State were printed by Ruralist Press, Inc. in Atlanta, Georgia; all other directories distributed in Maryland were printed by R.R. Donnelley & Sons Co. in Lancaster, Pennsylvania. On instructions from C & P, Ruralist delivered

the Garrett County directories, to which it attached pre-printed address labels supplied by C & P, to the United States Postal Service in Maryland; they were then distributed to subscribers through the normal delivery procedures of the Postal Service. The Comptroller conceded that those directories were not subject to the use tax; he approved the claim for refund, for 1979–82, as to them.

The other directories were not distributed by the Postal Service but by Directory Distributing Associates (DDA), an independent delivery service selected by and under contract with C & P. Donnelley and Ruralist delivered those directories from their respective plants to designated locations in Maryland, through carriers approved by C & P. DDA personnel met those carriers at those locations, transferred the directories either directly into DDA vehicles or into a storage facility for later loading into DDA vehicles, and effected the ultimate distribution to C & P or its subscribers.[1] The issues before us concern those directories.

C & P filed its initial application for refund with the Comptroller's Retail Sales Tax Division on June 16, 1982. It sought recovery of $460,403 for taxes paid on directories printed from October, 1977 through April, 1979 and $949,-677 for taxes paid on directories printed from May, 1979 through April, 1982. These amounts included taxes paid on directories distributed throughout the State, including Garrett County. In an attachment to its application, C & P asserted that the $949,677 claimed for the 1979–82 period was based on printing charges of $18,993,545, but there was no breakdown as between Garrett County and other directories.

The Retail Sales Tax Division denied the application on June 30, 1982. The 1977–79 claim for $460,403 was rejected

---

1. C & P apparently took possession of about 8% of the directories, either for its own use or for later distribution to new subscribers. At C & P request, another 5% were stored by DDA for later distribution to new C & P subscribers. The remaining 87% of the directories were distributed directly by DDA to existing C & P subscribers.

on the ground that it was not filed within the three-year period of limitations set forth in art. 81, §§ 348 and 399.[2]

Pursuant to § 351(a)(4) of art. 81, C & P requested a formal hearing before the Comptroller, which, for some reason, was not held until July 3, 1983—a year later. On the day of the hearing, C & P presented what it regarded as a supplemental claim for the 1979–82 period, increasing the amount of refund sought from $949,677 to $1,634,971, based on printing charges of $33,096,595. It was not possible, facially, to compare the initial and supplemental claims, to determine what the latter included that the former did not. The initial claim simply showed aggregate charges and taxes paid during four periods—May-December 1979, calendar year 1980, calendar year 1981, and January-April 1982—without any breakdown as to "yellow page," "white page," or combined directories. The "supplemental" claim showed, on a monthly basis, separate charges for "white page," "yellow page," and combined directories, but the totals of the columns for the whole period bear no similarity to the figures shown on the initial claim.

The Comptroller's hearing officer refused to consider the supplemental claim. She regarded it as a new claim that had not been presented within 30 days after notice of the assessment, as required by COMAR 03.06.01.80A(1). She denied the 1977–79 claim for $460,403 on limitations grounds. With respect to the initial 1979–82 claim for $949,677, C & P presented three arguments why the tax was not applicable:

> (1) C & P did not "use, store, or consume" those directories in Maryland, that being, under art. 81, § 373(a), the statutory basis for the tax;

---

**2.** Section 348 of art. 81 is part of the sales tax law. In 1982, it provided, in relevant part, that "whenever any taxpayer has erroneously ... paid the tax imposed by this subtitle ... the Comptroller shall refund such tax *if application therefor shall be made in writing within three years from the payment of the tax*...." (Emphasis added.) Section 399 is part of the use tax law; it incorporated, by reference, various sections of the sales tax law, including § 348.

   (2) The directories were continuously in the stream of interstate commerce and therefore were exempt both by Constitutional law and by §§ 326(f) and 375(b) of art. 81; and

   (3) The directories constituted "instruction books [or] other printed matter packaged with or obtainable only with the purchase of products held for sale" and were therefore exempt under COMAR 03.06.01.30A(2)(c).

The hearing officer agreed that C & P did not "use, store, or consume" the Garrett County directories and therefore approved a refund for those directories, subject to C & P establishing the amount of tax it paid with respect to them. She rejected all three arguments as to the DDA–delivered directories, however, and denied the balance of the claim.

In the Tax Court, C & P challenged the Comptroller's conclusions with respect to the $949,677 claim and the hearing officer's refusal to consider the supplemental claim for 1979–82. It acknowledged that the claim for 1977–79 was not timely but, complaining of a "gross inequity" in the law allowing the Comptroller *four* years to make a deficiency assessment but requiring taxpayers to seek refunds within *three* years, asked that the claim be considered on grounds of fairness.[3] Alternatively, it claimed the right to set off the amount paid in 1977–79 against any sales or use tax deficiency that may be assessed in an unrelated case. The Tax Court rejected C & P's argument as to the stale claim, including any right of setoff, and thus affirmed the Comptroller as to that. With respect to the 1979–82 claim, the Tax Court decided (1) that the Comptroller should have considered the supplemental claim and that it would do so, (2) that C & P did "use, store, or consume" the DDA–delivered directories in Maryland, (3) that those directories were not Constitutionally exempt from the tax by reason of

---

**3.** Effective July 1, 1984, the three-year statute of limitations for filing an application for refund was amended to four years. *See* 1984 Md. Laws, ch. 365. That Act, by its terms, however, applies only to tax payments made after June 30, 1984, and therefore would not serve to extend the limitations period for the taxes at issue here.

continuously being in the stream of interstate commerce, but (4) that they were exempt under the regulation. On that basis, it reversed the Comptroller's decision as to the 1979–82 claim.

The Circuit Court agreed with the Tax Court's rejection of both the 1977–79 claim and the statutory and Constitutional arguments made by C & P with respect to the 1979–82 claim. It disagreed with the Tax Court's construction of the regulation, however, and held that the directories were not exempt under that regulation. The court therefore affirmed the Tax Court on the 1977–79 claim but reversed on the 1979–82 claim.

The same questions presented below are raised before us: (1) did C & P "use, store, or consume" the DDA–delivered directories in Maryland; (2) if so, were those directories Constitutionally exempt from taxation; (3) were they exempt under the regulation; (4) was the Tax Court correct in considering the "supplemental" claim for 1979–82; and (5) is C & P entitled to a "setoff" of the amount paid in 1977–79 against taxes due in an unrelated matter? It will not be necessary for us to address question (4). The others we shall consider seriatim.

## II. *The Facts*

Questions (1) and (2)—whether the DDA–delivered directories fall within the ambit of § 373(a) and, if so, whether they are Constitutionally exempt from the tax imposed by that section—require us to look more closely at the procedures used for the delivery of the directories by the printers and their ultimate distribution by DDA. The underlying facts are not in substantial dispute.

Through negotiation, C & P and the printers established a production schedule for the directories and a given time span within which the printers were to make delivery of the directories. Prior to actual printing, C & P instructed the printers how many copies to print and where to deliver the copies. Directories destined for Baltimore were to be shipped to C & P "c/o Directory Distributing Associates,"

and the printer was told to contact one Lee Morris at a C & P number upon arrival in Baltimore "for delivery details." Directories headed for Landover, for distribution in the metropolitan Washington area, were to be shipped directly to DDA. In its General Instructions, C & P told the printer that "[s]hipping schedule details will be arranged through the coordinated efforts" of C & P, DDA, and the printer.

Under its contract with C & P, DDA was responsible for selecting the actual delivery sites, meeting the carriers hauling the directories from the printer, transferring the directories to its own vehicles, and making the ultimate distribution. In the rural areas, the transfers were made on parking lots, although in some instances it would take up to three days to complete the transfer. In Baltimore and Landover, DDA leased a warehouse on an annual basis where directories might be stored for up to a week as the transfers were taking place. In Hagerstown and Towson, DDA also rented facilities "for three weeks or a month, whatever it took to do the delivery."

While the precise details of the deliveries were apparently worked out by the printer and DDA and the physical work of transferring the directories from the printer's carrier to DDA's vehicles was handled by DDA, C & P was not entirely removed from the process. It received the delivery schedules from the printer and weekly delivery reports from DDA. The printer was instructed to call C & P when the directories arrived in Maryland, and one C & P supervisory employee was responsible for monitoring the transfer of directories to DDA. That employee, according to the testimony of C & P's Directory Delivery Operations Manager, would visit the transfer stations

"to assure herself there that was in fact a station there, that there was adequate room for receipt of the trailers on the parking lot, that there were people there who were prepared to issue routes, that the routes had been prepared and to adequately train the individuals to do the delivery. Having assured ourselves of that and the fact that the first truck came in on schedule or the fifth was

on schedule, whatever time that that person was visiting, she returned to the office to do other work."

The Operations Manager himself also visited the delivery points "to understand what the delivery contractor did for us and how he did it and further to be able to manage the supervisor who was assigned to do that work."

### III. *Section 373(a)*

As noted, § 373(a) imposes the tax on the "use, storage, or consumption in this State of tangible personal property ... purchased within or without this State...." Section 372(d) defines the terms "use, storage, or consumption" as "the exercise by any person within this State of any right or power over tangible personal property, or any keeping or retention in this State for any purpose of tangible personal property purchased either within or without this State." In light of this definition, the controversy centered on whether C & P exercised "any right or power" over the directories.

C & P acknowledges the exercise of dominion over the directories taken for its own use or retained by it or DDA for later distribution to new subscribers—the 13% noted in n. 1, *ante.* It disclaims any control over the other 87%, however, urging that those directories, from the time they reached Maryland, were in the exclusive control of the carriers or DDA. The Tax Court and the Circuit Court seemed, at least tacitly, to accept the notion that, if that were so, § 373(a) would not apply. Their decisions were based on the conclusion that it wasn't so—that C & P did indeed exercise some direct control over the carriers, DDA, and the distribution process; and it was on that basis that the Tax Court found as fact (and the Circuit Court affirmed as supported by substantial evidence) that C & P exercised a "right or power" over the directories.

We think that the Tax Court and the Circuit Court reached the right result on this question, but we have a somewhat broader view of the issue. It seems clear that, at least from the time the directories arrived in the State of Maryland and until they were actually delivered to the C &

P subscribers, they belonged to and remained subject to the control of C & P. *Compare Wis. Dept. of Revenue v. J.C. Penney Co.*, 108 Wis.2d 662, 323 N.W.2d 168 (Ct.App.1982). C & P had not merely a technical ownership but the right to determine who would get the directories and when and how further distribution would take place. That, for its own business reasons, it decided to contract with DDA to carry out that further distribution and to leave the precise details of the distribution to DDA does not and cannot change the legal relationship of C & P to those directories. DDA did not own the directories or have any real interest in them; it was merely a delivery service and its only authority over the directories was that delegated by C & P. Notwithstanding that DDA may have been an "independent contractor" rather than a servant or employee of C & P, the fact remains that, in distributing the directories, it acted only as an agent for C & P. It remained at all times subject to monitoring and overall direction by C & P, and, if it ever failed to proceed in accordance with C & P's general directions, C & P could and presumably would have terminated the contract and any relationship DDA had with the directories.[4]

The reality, then, is that DDA's handling of the directories is attributable to C & P, for whom it acted. *See Deere & Co. v. Allphin*, 49 Ill.App.3d 164, 7 Ill.Dec. 130, 132–33, 364 N.E.2d 117, 119–20 (1977); *Sears, Roebuck & Co. v. Woods*, 708 S.W.2d 374, 382 (Tenn.1986). Any other conclusion would allow a person otherwise subject to the tax to avoid it (and, indeed effectively to preclude collection of the tax from anyone) simply by employing an agent to use or store the taxable goods; that surely was not the legislative

---

4. C & P places great reliance on the fact that DDA was an "independent contractor" that had the "sole and exclusive care, custody and control" over the directories. As we pointed out in *Sanders v. Rowan*, 61 Md.App. 40, 484 A.2d 1023 (1984), however, a person who acts for or on behalf of another is no less an agent because he is an independent contractor rather than a servant. *See also Henkelmann v. Insurance Co.*, 180 Md. 591, 600, 26 A.2d 418 (1942).

intent. *See Palm Oil Recovery v. Comptroller,* 266 Md. 148, 160–61 (n.2), 291 A.2d 681 (1972).

The conclusion we reach is consistent with that of other courts in analogous cases. *See K Mart Corp. v. Idaho State Tax Comm'n,* 111 Idaho 719, 727 P.2d 1147 (1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1597, 94 L.Ed.2d 784 (1987); *Sears, Roebuck & Co. v. Woods, supra,* 708 S.W.2d 374; *K Mart Corp. v. S.D. Dept. of Revenue,* 345 N.W.2d 55 (S.D.1984); *Wis. Dept. of Revenue v. J.C. Penney, Co., supra,* 323 N.W.2d 168; and *cf. Miller Brewing Company v. Korshak,* 35 Ill.2d 86, 219 N.E.2d 494 (1966), *app.dism.* 386 U.S. 684, 87 S.Ct. 1325, 18 L.Ed.2d 405 (1967). *Compare District of Columbia v. W. Bell & Co.,* 420 A.2d 1208 (D.C.1980), and *Bennett Bros., Inc. v. State Tax Com'n,* 62 A.D.2d 614, 405 N.Y.S.2d 803 (N.Y.1978), involving a situation akin to the distribution of the Garrett County directories, where the item was delivered by the printer directly to the U.S. Postal Service and thereafter was distributed, allegedly without any control, direction, or handling by the "owner." [5]

## IV. *Stream of Commerce*

█ The State is not empowered to tax property "in transit in interstate commerce." *Minnesota v. Blasius,* 290 U.S. 1, 9, 54 S.Ct. 34, 36–37, 78 L.Ed. 131 (1933), and cases cited therein at n. 3; *see also W.R. Grace & Co. v. Comptroller,* 255 Md. 550, 258 A.2d 740 (1969). Indeed, sales not within the taxing power of the State under the U.S. Constitution are expressly exempted from the sales and use tax by the very statutes imposing those taxes. *See* art. 81, §§ 326(f) and 375(b). Relying on the proposition that a temporary interruption of goods in the course of interstate commerce does not affect the interstate nature of those goods, C & P asserts that the directories in question are not subject to the tax because, from their printing in Pennsylva-

---

**5.** As the Comptroller has conceded that no tax is due on the directories distributed through the U.S. Postal Service, we do not address that issue in this case.

nia until their ultimate delivery to the C & P subscribers, they remained constantly in the stream of interstate commerce. The transfer of the directories from the interstate carrier to the DDA vehicles, it claims, was "a mere change in the method of transportation" and "thus did not affect the continuity of the transit."

We reject that argument, for, as with the § 373 argument, it overlooks the real nature of the transaction. The subscribers did not order the directories from the printer; nor did C & P cause them to be printed and distributed as a charitable endeavor. C & P ordered and paid for the directories for its own business purpose. To operate an effective telephone service, it must supply its customers with directories; it is in fact required by regulation of the Public Service Commission to furnish directories to its customers. COMAR 20.45.04.11B. C & P recaptures the cost of supplying those directories through its charges for the telephone service. The transaction, then, was not between the printer and the subscribers that was temporarily interrupted by the reloading into DDA's vehicles. Donnelley and Ruralist were not selling or sending the directories to the subscribers, but to C & P. What C & P did with them after delivery and payment was of no concern to the printers.

■ Viewed in this way, it seems clear that the interstate shipment ended when, at C & P's instruction, the directories were delivered in Maryland, either directly to C & P or to its designated agent. So far as this record reveals, few of them ever left the State thereafter; a significant number (some 13%) were used or stored by or for C & P, others were distributed to its customers. *Compare W.R. Grace & Co. v. Comptroller, supra,* 255 Md. 550, 258 A.2d 740, and cases digested therein. This case, we think, falls squarely within the rule stated in *Minnesota v. Blasius, supra,* 290 U.S. at 10, 54 S.Ct. at 37:

"Where property has come to rest within a state, being held there at the pleasure of the owner, for disposal or use, so that he may dispose of it either within the state,

or for shipment elsewhere, as his interest dictates, it is deemed to be a part of the general mass of property within the state and is thus subject to its taxing power."

*See also Lane Corp. v. Comptroller,* 228 Md. 90, 94, 178 A.2d 904 (1962):

"The use tax is an excise on the privilege of using, storing or consuming specified property in Maryland. The measure of the tax is the purchase price. It is immaterial to the amount of the tax how long the owner uses or stores the property in the state—that he does so is enough."

We have no quarrel with the cases cited by C & P, but simply find them inapposite. *See Baltimore & O.S.W.R. Co. v. Settle,* 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189 (1922); *Illinois C.R. Co. v. DeFuentes,* 236 U.S. 157, 35 S.Ct. 275, 59 L.Ed. 517 (1915); *Atchison, T. & S.F.R. Co. v. Harold,* 241 U.S. 371, 36 S.Ct. 665, 60 L.Ed. 1050 (1916); *Western Oil v. Lipscomb,* 244 U.S. 346, 37 S.Ct. 623, 61 L.Ed. 1181 (1917); *Hughes Bros. Timber Co. v. Minnesota,* 272 U.S. 469, 47 S.Ct. 170, 71 L.Ed. 359 (1926); *Carson Petroleum Co. v. Vial,* 279 U.S. 95, 49 S.Ct. 292, 73 L.Ed. 626 (1929); *W.R. Grace & Co. v. Comptroller, supra,* 255 Md. 550, 258 A.2d 740. *Minnesota v. Blasius, supra,* 290 U.S. 1, 54 S.Ct. 34, 78 L.Ed. 131, actually supports the Comptroller's position, not that of C & P.

### V. *COMAR 03.06.01.30A(2)(c)*

Section 373(a), as noted, imposes the tax on the use, storage, or consumption in Maryland "of tangible personal property and certain services purchased within or without this State...." Section 372(i) defines "tangible personal property" as including the "printing of tangible personal property on special order for a consideration." It is evident, then, that the use, storage, or consumption of tangible personal property printed on special order for a consideration is ordinarily a taxable event, the tax being measured by the charge for the printing.

██ In order to avoid a pyramiding of the tax, however, § 372(d) excludes from the definition of "use, storage, or consumption" the "incorporation of tangible personal property, or the keeping or retention of possession in this State of tangible personal property for the purpose of incorporating said property, as a material or part of *other tangible personal property* to be produced for sale by manufacturing, assembling, processing or refining...." (Emphasis added.) *See also* § 324(f)(iii) providing a similar exemption from the State sales tax. This, of course, would also apply to printed material otherwise subject to the tax.

In furtherance of his administration of these sections, the Comptroller adopted a regulation, codified as COMAR 03.-06.01.30, dealing generally with the subject of printing. Section A of that regulation provides, in relevant part:

"(1) Charges for the printing of tangible personal property on special order for a consideration and sales of printed material on special order for a consideration when made to ultimate consumers are subject to tax.

(2) Charges for printing and sales of printed material for the purpose of resale in unchanged form or incorporation into a product which is to be sold are not subject to the tax. Examples of non-taxable charges are as follows:

(a) Charges for the printing and sale of labels or name plates to a person who will affix them to a product intended for sale;

(b) Charges for the printing and sale of tangible personal property used to package products held for sale where the packaging is non-returnable;

(c) Charges for the printing and sale of *direction sheets, instruction books*, warranties, *and other printed matter packaged with or obtainable only with the purchase of products held for sale.*"

(Emphasis added.)

C & P makes somewhat of a shotgun argument with respect to the regulation. Focusing on the more general

language of subsection A(2), it contends that the directories were printed for the purpose of resale to its subscribers or were incorporated into a "product which is to be sold." The "product," it argues, is the telephone service supplied to its customers. Turning then to subsection A(2)(c), it posits that the directories constitute direction sheets, instruction books, or other printed material packaged with or obtainable only with the purchase of "products"—the telephone service—held for sale.

The Tax Court, as we observed, accepted part of that argument. Finding the telephone service supplied by C & P to be a "product" within the contemplation of the regulation, it declared the directories to fall within the ambit of the example set forth in subsection A(2)(c). The Circuit Court regarded that conclusion as an error of law.

The "resale" argument appears to be a newly discovered one. We find no indication that it was presented to or considered or ruled upon by either the Comptroller or the Tax Court, and we see no merit whatever in it. The directories are not sold by C & P to its subscribers. They are distributed free of charge. There is no stated price for the directories, no terms of sale. Nor can they reasonably be regarded, under subsection A(2)(c), as "direction sheets" or "instruction books." Although the telephone directories, pursuant to regulations of the Public Service Commission (*see* COMAR 20.45.04.11), do contain assorted directions and instructions concerning how to use the telephone, it would be stretching words well beyond any reasonable elasticity to view the directories as "direction sheets" or "instruction books." Only about 2% of the directories seem to be devoted to directions or instructions; the other 98% contain the individual listings.

The major legal error committed by the Tax Court in this connection was in construing the word "product," as used in the regulation, to include the telephone service rendered by C & P and in then regarding the directories as somehow

being "incorporated" into that service or obtainable "only with the purchase of" that service.

The Comptroller seeks to restrict the word "product" to "tangible personal property," claiming that that is the way he has always interpreted it and urging that his long-time construction of his own regulation is entitled to great weight. Telephone service, he argues, is not "tangible personal property." The Circuit Court adopted that view.

We agree with the Comptroller and the Circuit Court. It is clear to us that the regulation was designed to aid in the construction and enforcement of §§ 372(d) and 324(f)(iii), and, although the Comptroller could have simply parroted those statutes and used the phrase "tangible personal property" instead of "product," we cannot say that his restrictive interpretation of the word "product" is either unreasonable or inconsistent with the statutes. That, of itself, undercuts the Tax Court's conclusion, for the Court of Appeals has made clear that the telecommunication services supplied by C & P do not constitute tangible personal property for purposes of the sales and use taxes. *See Comptroller v. C. & P. Tel.,* 241 Md. 345, 216 A.2d 717 (1966); *also Quotron Systems v. Comptroller,* 287 Md. 178, 411 A.2d 439 (1980); *Craftsman Press, Inc. v. Comptroller,* 52 Md.App. 96, 447 A.2d 111, *cert. denied,* 294 Md. 543 (1982).

Quite apart from that, however, we see nothing in the record before the Tax Court to indicate that the directories were "packaged with or obtainable only with the purchase of" the telephone service. The record itself indicates that some of the directories were available to non-subscribers, and, at oral argument, counsel conceded that, as a matter of good public relations, C & P would likely give a directory to anyone who asks for it, whether or not the person is a subscriber. Even if the telephone service were regarded as a "product," therefore, there was no substantial evidence to support a finding that the example stated in the regulation applied.

### VI.  *The Supplemental Claim*

Whether the Comptroller's hearing examiner was wrong in refusing to consider the supplemental claim (or, conversely, whether the Tax Court was wrong in agreeing to consider it) is essentially moot.  We believe that the Circuit Court was right on the merits of the underlying issue of taxability, and so, whether the 1979–82 claim was for $949,677 or $1,634,971, it was properly rejected.

### VII.  *Setoff*

The factual basis of C & P's claim of setoff is not entirely clear.  We are told that, at some point, the Comptroller issued a deficiency assessment against C & P for sales or use taxes due for the period October, 1977—April, 1979.  That assessment has nothing whatever to do with the taxes at issue in this proceeding;  C & P contested the assessment and the matter is now pending in the Circuit Court for Baltimore City.  Though now acknowledging that its claim for a refund of $460,403 for taxes paid during that period is barred by limitations, C & P asks us, under a theory of "equitable setoff," to give it credit for that amount nonetheless, by applying it as an offset against any amount it may end up owing to the Comptroller in the other case.  We decline to do so.

There is some authority for the proposition advanced by C & P—that where the taxing authority opens the question of a taxpayer's liability for past years, the taxpayer is entitled to set off against a deficiency finally determined any amount of overpayment of similar taxes during that period, even though a timely refund claim was not filed.  *See National Cash Register Co. v. Joseph,* 299 N.Y. 200, 86 N.E.2d 561 (1949).  The problem for C & P is that, by reason of the conclusions reached in Parts III–V of this Opinion, it would not have been entitled to a refund of the taxes paid for 1977–79, even if its claim had been filed timely.  There is, accordingly, nothing to set off.

JUDGMENT AFFIRMED;

APPELLANT TO PAY THE COSTS.