561 A.2d 1034

**The CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF MARYLAND**

v.

**COMPTROLLER OF THE TREASURY, RETAIL SALES TAX DIVISION.**

**No. 143 Sept. Term, 1987.**

Court of Appeals of Maryland.

July 31, 1989.

**4**

T. Scott Basik and Charles R. Moran (Semmes, Bowen & Semmes, all on brief) Baltimore, for appellant.

Deborah B. Bacharach, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Linda Koerber Boyd, and Gaylin Soponis, Asst. Attys. Gen., all on brief) Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

COLE, Judge.

Maryland imposes a five percent tax (commonly known as the "use tax") on the "use, storage or consumption in this State of tangible personal property purchased within or without this State...." Md.Code (1980 Repl.Vol., 1987 Cum. Supp.) Art. 81, § 373(a).[1] This case concerns a telephone company's claims for refund of "use taxes" paid in connection with telephone directories distributed to its customers. We set forth the pertinent facts.

---

1. The Use Tax has been recodified in pertinent part in the Md. Tax–Gen.Code Ann. § 11–102(a)(2) (1988).

The Chesapeake and Potomac Telephone Company of Maryland (C & P) is required to supply its customers with yearly editions of telephone directories as part and parcel of their telephone service. Directories are provided free of any charge additional to that paid for the basic telephone service. They contain listings of subscribers' names, addresses, and telephone numbers, as well as information on types of telephone service, how to use the telephone book itself, and how to make certain types of calls.

C & P delegated the production and distribution of the directories to other parties, but remained integrally involved in both aspects of the process. First, C & P compiled the data to be contained within each of the twenty-six different telephone directories for the various geographical areas of Maryland. After having a "camera ready" copy made of the listings, the copy was sent to Georgia and Pennsylvania printers with whom C & P had contracted to print the books. After printing, next came the books' delivery to C & P's Maryland customers.

Directories for Garrett County customers were shipped by common carrier from Georgia to Garrett County where they were deposited into the United States mail and delivered by the Postal Service. The Comptroller conceded that books so delivered should not be subject to the use tax and, as a result, allowed C & P a refund for taxes paid on the Garrett County directories.

The telephone books destined for localities other than Garrett County were shipped by common carrier from Pennsylvania or Georgia to delivery stations throughout Maryland. C & P contracted with Directory Distributing Associates ("DDA"), a Missouri corporation which hired drivers who, within several days to a week of the directories' arrival in Maryland, would meet at distribution points, load their individual cars or station wagons, and distribute the telephone books according to C & P's precise instructions.

These instructions were primarily embodied in a 145–page contract between C & P and DDA which provided that C &

P furnish DDA with instructions for each delivery showing the name, address, telephone number, and number of directories for each recipient. Moreover, C & P was to furnish DDA with a schedule of delivery shipments, an estimate of the number of directories to be delivered, instructions for disposal of old directories picked up, and location of delivery headquarters, if provided by C & P. Still other specifications required that: "Under no circumstances will directories be left at curbside, placed in mailboxes or be thrown. All directories must be delivered to the customer's door;" DDA "shall use only delivery equipment approved by C & P;" DDA "will (a) deliver directories during daylight hours; (b) DDA will not deliver directories on Sunday or legal holidays; (c) any exception to a or b above must have prior approval of (C & P)." C & P contractually required DDA to complete the deliveries within a specific maximum time period related to the number of directories to be delivered, as well as to provide daily reports detailing numerous aspects of the delivery process. Moreover, to ensure that deliveries would be made as contracted, a C & P supervisor spent approximately twenty-five days per year verifying DDA's performance of the contract.

Based on these facts, the Comptroller of the Treasury (the Comptroller) assessed, and C & P paid, use taxes on the cost of the telephone directories it had printed and distributed to its Maryland customers between October, 1977, and April, 1982. C & P then sought a refund totalling $2,095,-375.56 from the Comptroller which was in major portion denied. The Maryland Tax Court affirmed the Comptroller's denial of the claim for October, 1977, to April, 1979, but ordered a refund for the May, 1979, to April, 1982, period. The Circuit Court for Baltimore City affirmed the Tax Court's ruling on the 1977–79 claim but reversed on the 1979–82 claim. In effect, the circuit court denied C & P any refund beyond that granted by the Comptroller. The Court of Special Appeals affirmed in a reported opinion, *C & P Telephone v. Comptroller*, 72 Md.App. 293, 528 A.2d 536 (1987). We granted C & P's petition for a writ of certiorari.

■ As the first of three issues C & P argues that application of the use tax in this case is unconstitutional since it is a tax on property in interstate commerce.[2] In particular, C & P stresses that the directories remained continuously in the stream of interstate commerce until they arrived at their final destination, the premises of C & P's Maryland customers. C & P concludes that the United States "Constitution does not permit a state to impose a tax on property in interstate commerce." However, recent Supreme Court cases make clear what is currently the applicable law.

In *D.H. Holmes Co. Ltd. v. McNamara*, 486 U.S. 24, 108 S.Ct. 1619, 100 L.Ed.2d 21 (1988), the Supreme Court noted that "it really makes little difference for Commerce Clause purposes whether appellant's catalogs 'came to rest' in the mailboxes of its Louisiana customers or whether they were still considered in the stream of interstate commerce;" such interstate commerce may still be required, with certain restrictions, to pay its fair share of state taxes. 486 U.S. at ——, 108 S.Ct. at 1623, 100 L.Ed.2d at 27. The D.H. Holmes Company is a Louisiana corporation which contracted with several New York companies to design and print its merchandise catalogs which were actually printed in Atlanta, Boston, and Oklahoma City. The catalogs were shipped free of charge to the addressee and their entire cost was paid for by Holmes. Holmes paid no sales tax where the catalogs were printed. The Louisiana Department of Revenue and Taxation determined that Holmes owed a use tax on the value of the catalogs distributed in Louisiana. This decision was upheld by the Louisiana courts and Holmes

---

**2.** The Commerce Clause of the United States Constitution, Art. 1, § 8, cl. 3, provides that Congress shall have the power "[t]o regulate Commerce of foreign nations, and among the several states, and with the Indian Tribes." Even where Congress has not acted affirmatively to protect interstate commerce, the so-called dormant Commerce Clause prevents the states from discriminating against such commerce.

appealed to the United States Supreme Court contending the levying of the tax violated the Commerce Clause.

The Supreme Court relied on its holding in *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), *reh'g denied* 430 U.S. 976, 97 S.Ct. 1669, 52 L.Ed.2d 371, in which it upheld the right of Mississippi to impose a tax on the appellant's business of in-state transportation of motor vehicles manufactured outside the State. The Court laid down a four part test to determine if the State could impose a tax for the privilege of doing business within the State: (1) whether the taxpayer's activity had a substantial nexus with the taxing state; (2) whether the tax was fairly apportioned; (3) whether the tax was non-discriminatory against interstate commerce; and (4) whether the tax fairly related to benefits provided by the State. 430 U.S. at 287, 97 S.Ct. at 1083, 51 L.Ed.2d at 336.

Applying these criteria to the facts of this case, we conclude that the use tax imposed upon C & P's telephone books does not violate the Commerce Clause. First of all, distribution of the directories reflects a substantial nexus with Maryland. C & P was contractually bound to deliver them to its customers in Maryland; moreover, the books constitute an important ingredient in providing the telephone service upon which C & P generates its profits in Maryland. Nevertheless, C & P asserts that it did not exercise any right or power over the directories in Maryland, and therefore, it should not be assessed for the use tax. The Supreme Court, in *D.H. Holmes,* 486 U.S. at ——, 108 S.Ct. at 1624, 100 L.Ed.2d at 28, answered this contention rather pointedly:

Holmes' contention that it lacked sufficient control over the catalogs' distribution in Louisiana to be subject to the use tax verges on the nonsensical. Holmes ordered and paid for the catalogs and supplied the list of customers to whom the catalogs were sent; any catalogs that could not be delivered were returned to it.... There is "nexus" aplenty here.

Here, there is no merit in C & P's contention that it exercised no substantial degree of control over the directories in Maryland. As did the taxpayer in *D.H. Holmes,* C & P ordered and paid for the directories, supplied the list of customers to whom they were sent, and any directories that could not be delivered were returned to C & P. Moreover, both through the earlier noted contractual provisions detailing the acceptable mode of delivery, as well as C & P's supervision of DDA's delivery procedure, C & P clearly exercised abundant control over the directories in Maryland. Additionally, C & P maintains a significant economic presence in Maryland. In light of these factors, the nexus prong is satisfied.

We also find the Maryland use tax statutory scheme to be fairly apportioned, for it provides a credit against the use tax for sales taxes that have been paid in other states. *See* Md. Tax–General Code Ann. § 11–221(c) (1986); Md.Ann. Code Art. 81, § 375(c) (1975 Repl.Vol.); *D.H. Holmes, supra,* 486 U.S. at ——, 108 S.Ct. at 1623, 100 L.Ed.2d at 28.

Similarly, Maryland's use tax structure does not discriminate against interstate commerce. To the contrary, use taxes compensate a state for revenue lost when residents buy goods out-of-state for use within the state. Maryland's use tax rate of five percent confirms this purpose since it equals the sales tax rate applicable to goods purchased in-state; in fact, the same section of the Code currently sets forth both taxes. *See* Md. Tax–General Code Ann. § 11–102; *D.H. Holmes, supra,* 486 U.S. at ——, 108 S.Ct. at 1624, 100 L.Ed.2d at 28 (a legitimate goal of taxation is "to compensate the state for revenue lost when residents purchase out-of-state goods for use within the State.") In this regard, our characterization of Maryland's use tax in *Lane Corp. v. Comptroller,* 228 Md. 90, 93–94, 178 A.2d 904 (1962), is as true today as it was then:

In the words of Mr. Justice Cardozo, in approving for the Supreme Court the use tax of the State of Washington in *Henneford v. Silas Mason Co.,* 300 U.S. 577, 584 [57 S.Ct. 524, 527], 81 L.Ed. 814 [ (1937) ], the present purpose and

design of the Maryland use tax is, as it has been since its enactment, to make sure that "when the account is made up, the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates." He also said what we think is true here: "Equality is the theme that runs through all the sections of the statute." Id. at 583 [57 S.Ct. at 527].

Finally, the tax imposed upon C & P appears fairly related to benefits provided by the State of Maryland. C & P benefits from fire and police protection, maintenance of public roads, and a host of other civic services provided by the state. As a consequence, the fourth prong of the *Complete Auto* test is satisfied, and imposition of the use tax on C & P does not violate the Commerce Clause.

■ C & P next contends it exercised no rights over the telephone books in Maryland and thus is exempt from the use tax. As noted, § 373(a) of Art. 81 imposes a tax on the "use, storage or consumption in this State of tangible personal property...." The statute defines "use, storage, or consumption" as "the exercise by any person within this State of any right or power over tangible personal property...." Art. 81, § 372(d). C & P urges that since DDA usually delivered the directories almost immediately after their arrival in Maryland, "C & P had no opportunity to provide instructions or dictate the delivery process to DDA once the directories arrived in Maryland." We see no merit in this argument. As noted earlier, the Supreme Court rejected a similar contention in *D.H. Holmes, supra,* 486 U.S. at ——, 108 S.Ct. at 1624, 100 L.Ed.2d at 28, as having a hollow base.

Here, C & P ordered and paid for the books and supplied the list of customers to whom DDA was to deliver them. Moreover, C & P provided precise instructions and specifications for the delivery process in Maryland; it seems immaterial to us that these instructions were dictated before rather than after the books' arrival in Maryland. At all

times, C & P, and only C & P, exercised power and control over the directories.

Thus, as we see it, C & P exercised substantial rights and powers over tangible personal property in this state, thereby satisfying the statutory definition of "use, storage, or consumption" and rendering itself liable for payment of the use taxes levied on the directories by the Comptroller.

■ Finally, C & P argues that the telephone directories should not be subject to the use tax since under Sales Tax Regulation .30A(2) (COMAR .03.06.01.30A(2)) the books fall within the exemption from taxation for "printed matter packaged with or obtainable only with the purchase of products held for sale." In full, the regulation provides as follows:

.30 Printing

A. Charges for Printing and Sales of Printed Material.

      *      *      *      *      *      *

(2) Charges for printing and sales of printed material for the purpose of resale in unchanged form or incorporation into a product which is to be sold are not subject to the tax. Examples of nontaxable charges are as follows:

      *      *      *      *      *      *

(c) charges for the printing and sale of direction sheets, instruction books, warranties and other printed matter packaged with or obtainable only with the purchase of products held for sale.

Initially, we note that the following rules are applicable to exemptions from taxing statutes:

It is fundamental that statutory tax exemptions are strictly construed in favor of the taxing authority and if any real doubt exists as to the propriety of an exemption that doubt *must* be resolved in favor of the State. In other words, "to doubt an exemption is to deny it." ... [T]he State's taxing prerogative is never presumed to be

relinquished and the abandonment of this power must be proved by the party asserting the exemption.

*Xerox Corp. v. Comptroller,* 290 Md. 126, 137, 428 A.2d 1208 (1981) (emphasis in original) (quoting from *Perdue v. St. Dep't of Assess. & T.,* 264 Md. 228, 232–33, 286 A.2d 165, 167–68 (1972) and *Suburban, etc. Gas Corp. v. Tawes,* 205 Md. 83, 87, 106 A.2d 119, 121 (1954). *See also Supervisor of Assess. v. Carroll,* 298 Md. 311, 318, 469 A.2d 858 (1984).

We need not reach the issue of whether C & P's telephone service qualifies as a "product held for sale" because we find the exemption inapt on another ground. Specifically, as C & P concedes, a number of directories are made available to out-of-state non-customers of C & P. Thus, the directories were not "obtainable only with the purchase of" C & P's telephone service. As a result, the books do not fall within the coverage of the claimed exemption.

For the reasons stated herein, the judgment of the Court of Special Appeals, upholding the use tax assessment against C & P, is affirmed.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY THE COSTS.